UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOSEPH M.,[1]

                                    Plaintiff                    DECISION AND ORDER

-vs-
                                                                 1:19-CV-1052 CJS

COMMISSIONER OF SOCIAL
SECURITY,

                                    Defendant.

_____


INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which

denied the application of Plaintiff for Social Security Disability Insurance benefits.   Now before

the Court is Plaintiff's motion (ECF No. 9) for judgment on the pleadings and Defendant's

cross-motion (ECF No. 14) for the same relief.   For the reasons discussed below, Plaintiff's

application is granted, Defendant's application is denied, and this matter is remanded for

further administrative proceedings.

STANDARDS OF LAW

The Commissioner decides applications for SSDI and SSI benefits using a five-step

sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20
> C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the
> claimant is currently engaged in substantial gainful activity. If he is not, the

---

[1]  The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the
United States District Court for the Western District of New York, any non-government party will be identified and
referenced solely by first name and last initial."

Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2]  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported

---

[2]  Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

2

by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court has carefully reviewed the administrative transcript consisting of approximately two thousand pages, most of which is treatment notes from providers employed by the U.S. Department of Veterans Affairs ("VA").   The Court will refer to the record only as necessary for purposes of this Decision and Order.

Plaintiff claims to have suffered a traumatic brain injury ("TBI") at age nine when he fell off a bicycle, though the record contains no medical records dating back that far. Nevertheless, Plaintiff claims that he subsequently experienced headaches attributable to that injury, which have gotten worse over time.   Plaintiff claims to have had a difficult upbringing, initially living alone with his mother in poverty, and later with an abusive stepfather.[3]   Plaintiff indicates that he was bullied in school.[4]

Plaintiff completed high school in regular education classes, and later enlisted in the

---

[3]  See, e.g., Tr. 779, 782.
[4]  Tr. 1231, 1237-38.

U.S. Army.   Plaintiff remained in the army for three years, as a Combat Engineer, until he was honorably discharged in 2002.   Plaintiff spent his Army career stationed in Germany, though he was deployed to Kosovo for six months.   While in Kosovo, Plaintiff's unit was required to detonate unexploded bombs, and Plaintiff saw children who had been wounded by bombs, which disturbed him.[5]   While in the Army and for some time thereafter, Plaintiff excessively used cigarettes, alcohol[6] and illegal street drugs.

After leaving the military, Plaintiff became overweight and deconditioned.[7]   Plaintiff has also been treated for a variety of ailments, including esophageal cancer, asthma, diabetes, dizziness, chronic headaches, enlarged prostate, gastrointestinal problems   (IBS, GERD) and sleep apnea.   The esophageal cancer and prostate problems appear to have been successfully treated with surgery, but the other problems persist.   In particular, the sleep apnea and diabetes have been poorly controlled at times, resulting in various secondary symptoms including headaches and dizziness.[8]

In 2013, Plaintiff had an accident while driving his all-terrain vehicle ("ATV") and was taken to the hospital.   The record contains references to Plaintiff having perhaps suffered a second TBI during that accident. However, a treatment note made two weeks after the ATV accident indicated that Plaintiff had been wearing a helmet and sustained only relatively minor injuries. Tr. 1253.   The record also contains vague references to Plaintiff having sustained multiple concussions during adulthood, but the Court sees no actual evidence of such injuries.

---

[5] There is no indication that Plaintiff sustained any physical injury while in the Army, and specifically no TBI. Tr. 774.

[6] Tr. 777.

[7] Plaintiff had shortness of breath due to being out of shape. Tr. 473.

[8] Plaintiff has indicated that he 'can't tolerate" wearing his prescribed CPAP mask while sleeping. Tr. 457; see also, Tr. 970 (variable compliance with CPAP) and Tr. 971 (Diabetes poorly controlled).

In June 2014, Plaintiff treated at the VA concerning his feeling that there was "something wrong with him, citing concentration/memory issues, anger, and anxiety as his primary concerns." Tr. 380.   At that time, the VA classified Plaintiff as 70% disabled due to post-traumatic stress disorder ("PTSD"). Tr. 380.   After some outpatient therapy, Plaintiff attended an in-patient VA PTSD program for a month, Mondays through Fridays. Tr. 380. Upon discharge from that program, a VA doctor indicated that some of Plaintiff's problems involved difficulty with interpersonal issues and issues at home, and that Plaintiff had learned new coping strategies and met his treatment goals. (Tr. 380-381).   The doctor indicated that Plaintiff might want to pursue "deeper" treatment to address childhood issues. Tr. 381.   The prognosis was "guarded" "given [the] severity and chronicity of [Plaintiff's] symptoms." Tr. 381. Plaintiff subsequently continued treatment with a "non-VA psychiatrist" and with a neurologist regarding intermittent dizziness. Tr. 384.

On July 25, 2014, Plaintiff indicated that he was having worsening problems with memory and forgetting words. Tr. 1323.   Test results were consistent with cognitive impairments in the areas of memory, attention and judgment. Tr. 1324.

On July 30, 2014, Plaintiff told his VA PTSD therapist that he had been experiencing intermittent dizziness for years and was pursing treatment with a neurologist. Tr. 1305. Plaintiff stated that he was feeling anxious and emotionally vulnerable while thinking about returning to work as a prison guard[9]  after his in-patient treatment was finished, and that he was having nightmares about work and felt he needed additional therapy. Tr. 1305.

---

[9] Prior to the alleged disability onset, Plaintiff was employed for more than seven years as a security guard at the Buffalo Federal Detention Facility, which houses immigration detainees.   Plaintiff indicates that his job in that regard was equivalent to that of a corrections officer in a maximum-security prison.

On August 27, 2014, Plaintiff indicated that he was having dizziness, and that he had reduced his work as a prison guard to part time, due to headaches and stress. Tr. 1257.

On August 28, 2014, Plaintiff complained of feeling depressed, hopeless, angry, irritable and self-destructive since leaving the military twelve years earlier. Tr. 1252.   Plaintiff indicated that he was sleeping poorly and had started having "panic attacks," involving a feeling of claustrophobia, four years earlier. Tr. 1252.   The therapist noted that Plaintiff had reported ongoing mood issues related to his marriage and was pursuing marriage counseling. Tr. 1253. A mental status exam was unremarkable, and Plaintiff was directed to continue therapy.

Despite the various problems just discussed, Plaintiff continued to work.   However, on November 21, 2017, Plaintiff stopped working, and shortly thereafter he filed the subject application for disability benefits.

Plaintiff has reportedly offered a number of explanations for why he stopped working on November 21, 2017.   On November 28, 2017, Plaintiff told a VA doctor that he was "having difficulty working," in that, "[b]esides PTSD symptoms he is having medical problems." Tr. 830. On February 6, 2018, Plaintiff told a VA therapist that he was "not working until further notice owing to PTSD (unfit for duty)" and that "short-term disability [was] not paying him." Tr. 780. On February 9, 2018, Plaintiff told a VA doctor that he was "on medical leave" from the detention facility but did not want to apply for disability and was considering whether he could perform some other kind of work, though he had decided that he "could not continue as a full-time corrections officer." Tr. 388.   On February 23, 2018, Plaintiff told a VA doctor that he stopped working at the detention facility "because he was having difficulty managing his emotions in that environment." Tr. 462.   On March 13, 2018, Plaintiff told a VA pharmacist that

he had stopped working "due to a PTSD, hypoglycemic event." Tr. 430.   On March 28, 2018, Plaintiff told a consultative psychologist that he had been fired from his job after being "deemed unfit for duty [due] to mental health problems," Tr. 335, though, in fact, his employer neither fired him nor deemed him unfit for duty. Tr. 51.   On July 3, 2018, Plaintiff told a VA neurologist that he had "retired" as a prison guard mainly due to PTSD, dizziness, difficulty communicating with people in a normal manner, and impaired attention and concentration. Tr. 1220.

At the administrative hearing concerning his application for Social Security disability benefits, Plaintiff initially testified that he had stopped working due to "medical issues," and specifically, due to his "second mini stroke, [transient ischemic attack] TIA." Tr. 51.   Plaintiff further stated that he had been "forced to quit that job," since his employer would "not let [him] go." Tr. 51. Upon further questioning by the ALJ, Plaintiff acknowledged that he may not actually have had a TIA, but that in any event he had felt forced to quit due to "all [of his] medical issues." Tr. 51.   When the ALJ asked Plaintiff what he meant by "medical issues," Plaintiff stated, "Stress, a lot of the side effects of PTSD, hypervigilism[.]" Tr. 53.

Regarding the specific "medical issues" to which Plaintiff referred in the preceding paragraph, the Court will briefly summarize the treatment notes from the months leading up to Plaintiff's decision to stop working and apply for Social Security disability benefits.

On February 15, 2017, Plaintiff told VA treating nurse practitioner Kathleen Vertino ("Vertino"), who monitored Plaintiff's mental health medications for depression and anxiety, that his job was going "okay," that he had an active social life, that he was less stressed, and that he wanted to cut down his mental health medications. Tr. 1117.   Vertino reported a

normal mental status exam. Tr. 1117.   However, Plaintiff did admit to passing intermittent suicidal ideation. *See. e.g.*, Tr. 122.   Moreover, Plaintiff was continuing to receive therapy for PTSD, depression and anxiety.

On February 28, 2017, Plaintiff told his VA primary care doctor that he wanted the VA to classify him as disabled due to sleep apnea, and that he wanted the VA to prescribe him a Sleep Number Bed. Tr. 1106. (The VA had already deemed Plaintiff partially disabled due to PTSD and other conditions, thus Plaintiff was asking the doctor to add another category of disability)   The doctor responded that he would not write such a prescription, and that losing weight would be a more effective means of addressing the sleep apnea. Tr. 1106.   At that time, Plaintiff reportedly denied having anxiety, depression or suicidal ideation. Tr. 1107.

On March 21, 2017, Plaintiff told his neurologist that he was having headaches almost daily upon waking, and that he was not using his CPAP machine. Tr. 1101.   The neurologist noted that the headaches were likely due to stress and the effects of sleep apnea. Tr. 1103.

On March 24, 2017, Vertino reported that Plaintiff had a normal mental status examination ("MSE"), with "no evidence of acute symptoms, SI [(suicidal ideation)] or safety issues." Tr. 1099.   On March 24, 2017, Plaintiff told his therapist that he tended to focus on work to get his identity, and that he did "not get satisfaction" from his current job. Tr. 1101.

On March 31, 2017, Plaintiff stated that his general health was "good" and that he was "feeling well." Tr. 1097.

On April 9, 2017, Plaintiff had an incident at work in which he experienced chest pain, slurred speech and bilateral weakness. Tr. 1052-1067.   Plaintiff was taken to the emergency room ("ER") and evaluated for a "possible [transient ischemic attack] TIA," though his

symptoms had abated by the time he reached the hospital and all diagnostic tests were normal. Tr. 1067.   The hospital discharged Plaintiff with instructions to follow up with his regular doctors for further testing to rule out possible problems, such as heart arrythmia or atrial fibrillation related to sleep apnea. Tr. 1086.   Such testing was negative. Tr. 1051. Notably, in that regard, when Plaintiff had his symptoms on April 9, 2017, he was already scheduled to have surgery for an enlarged prostate some ten days later.   Since there were no positive findings related to the symptoms that had occurred on April 9, 2017, Plaintiff was cleared for surgery, which he had on or about April 19, 2017. Tr. 1026.   Following that urological surgery, Plaintiff was cleared to return to work on May 4, 2017, "full duty, no restriction." Tr. 1000-1001, 1026.

Subsequent entries in Plaintiff's VA medical record note that Plaintiff claimed to have suffered a stroke or TIA during the incident on April 9, 2017, although neither stroke nor TIA are listed as one of plaintiff's medical issues. *See, e.g.*, Tr. 358, 430,433, 445-46, 645, 727.[10] On April 17, 2017, a VA pharmacist referred to Plaintiff's symptoms on April 9, 2017, as "chest pain of uncertain etiology." Tr. 1085; *see also, id*. at 1091.   Another VA doctor later described the incident by noting that Plaintiff had been evaluated "for a possible TIA," but that "there was no evidence of a TIA/ACS, and his symptoms were thought to be secondary to somatization or stress.   He was having a significant amount of anxiety at the time these symptoms occurred." Tr. 763; *see also, id*. at 788-789 (same).

On July 19, 2017, Plaintiff told his VA therapist that he had recently had "a stroke," that

---

[10]  *See, e.g.*, Tr. 727 ("Patient reports hx of TIA x2"); 343 (told agency consulting physician that he had had two TIAs)..

he was depressed, and that he was "frustrat[ed] with work and feeling trapped there." Tr. 996.

On July 21, 2017, Plaintiff went to the ER with symptoms similar to those he had on April 9, 2017, that is, chest pain and weakness. Tr. 1700.   The diagnosis was "near syncope," and the discharging doctor indicated that the symptoms might be related to diabetes, and that Plaintiff should perhaps begin on diabetes medications. Tr. 1700-1703.

On July 25, 2017, Plaintiff complained of dizziness related to low blood sugar, but he denied any anxiety, depression of suicidal ideation, and his MSE was unremarkable. Tr. 979-983.

On August 7, 2017, Plaintiff injured his back when he slipped at work but caught himself before he fell. Tr. 285, 1317, 1723.    Plaintiff went to the ER, where x-ray results were normal and the diagnosis was muscle strain. Tr. 1726.

On August 11, 2017, Plaintiff's doctor prescribed Metformin for Plaintiff's diabetes, noting that diet alone was not controlling the problem. Tr. 988.

On August 16, 2017, Plaintiff indicated to his neurologist that he was not working and was pursuing a "comp case" related to a back injury. Tr. 966-67.   Plaintiff stated that he had a "TIA" a few months earlier when his blood sugar was low, and that his diabetes was not well controlled.   Tr. 967.   Plaintiff indicated that he had migraine headaches twice per week. Tr. 967.   Plaintiff also noted that he had tremors that got worse when he was nervous.   The neurologist noted that Plaintiff was diagnosed with "essential tremor, migraine, and daily headaches, often on awakening, associated with sleep apnea." Tr. 967.

On September 14, 2017, Plaintiff had a normal MRI test of his lumbar spine, and a doctor indicated that his back pain had resolved and that he had zero percent continuing

impairment from that injury. Tr. 284-289.

On September 28, 2017, Vertino reported that Plaintiff was returning to work after being out due to a back injury, and that the results of her mental status exam were normal. Tr. 905. That same day, however, Plaintiff went to the ER complaining of dizziness, which he attributed to taking Metformin for his diabetes, though he denied depression or suicidal ideation, and a neurological examination was normal. Tr. 912-913.   Also, that day Plaintiff called the VA complaining of increased back pain. Tr. 920.

On October 30, 2017, Plaintiff told Vertino that he had returned to work because he needed money, and that his work situation was "tolerable." Tr. 890.   Plaintiff indicated that he had stress related to family relationships and that he had recently ended his relationship with his girlfriend. Tr. 890.   Vertino reported a normal MSE with no suicidal ideation. Tr. 891.

On November 21, 2017, the incident occurred, discussed earlier, that marked Plaintiff's last day of work.   That day, Plaintiff was at work as a prison guard when he experienced an episode, similar to what had occurred on April 9, 2017.   It lasted about ten minutes, during which he had chest pain. Plaintiff went to the ER to be evaluated for a possible heart attack, and the tests that were performed were normal. Tr. 1737.   However, Plaintiff declined to remain at the hospital for further evaluation, and went home before any specific diagnosis was made. Tr. 1730-1737.   Nevertheless, Plaintiff refers to this incident as his "second TIA."

On November 24, 2017, Plaintiff went to the VA ER and was examined by Joseph Bart, M.D. ("Bart").   Plaintiff explained to Bart what had happened on November 21, 2017, and how he had gone to the ER but had declined to stay for observation. Tr. 836.   Plaintiff told Bart that he presently felt normal except for some increased anxiety. Tr. 836.   Bart noted that Plaintiff's

12

prior complaint of radiculopathy had "passed," and that his complaints of chest pain were associated with increased stress and anxiety. Tr. 837.   Plaintiff indicated that he needed a doctor's clearance to return to work, and Bart provided it, stating, "I see no evidence of any physical condition that would prohibit him from employment." Tr. 837.

Nevertheless, as already discussed, Plaintiff did not return to work.   Instead, the record indicates that Plaintiff generally continued to complain of the same problems as before (PTSD, anxiety, depression, diabetes, sleep apnea, chronic headaches, dizziness), but with increased complaints of suicidal ideation.

On December 9, 2017, Plaintiff told his VA therapist that he had increased depression, decreased motivation and a feeling that his body was "working against him." Tr. 816.   Plaintiff also stated that he had suicidal ideation, which disturbed him. Tr. 816.   Plaintiff further indicated that he felt his diabetes was causing him shaking and dizziness. Tr. 811.   That same day, Plaintiff wrote to the VA that he was having suicidal ideation and was "out of work due to his mental state." Tr.

On January 8, 2018, Plaintiff was requesting that the VA complete forms to allow him to receive disability payments from his employer. Tr. 809.

On February 6, 2018, a VA therapist expressed concern that Plaintiff's use of medical marijuana was contributing to his self-isolating behavior, lack of motivation and increased depression. Tr. 780.

On February 9, 2018, VA psychologist William Reynolds ("Reynolds") completed a "Disability Benefits Questionnaire" concerning Plaintiff's PTSD. Tr. 385-392.   Reynolds indicated that his report was based on his personal examination of Plaintiff in 2014 and on his

review of the subsequent VA treatment records.   Reynolds indicated that Plaintiff was diagnosed with PTSD, depressive disorder and "mild neurocognitive disorder due to TBI," and that the last of these diagnoses was new and represented a worsening of Plaintiff's condition. Tr. 386.   Reynolds listed all of Plaintiff's mental/cognitive symptoms and described how each symptom was related to the three diagnoses. Tr. 386.   Reynolds reported, for example, that Plaintiff had headaches and memory problems related to his TBI, and that both PTSD and TBI caused Plaintiff to have irritability, sleep disturbance and concentration problems. Tr. 386. Reynolds also listed clinical findings supporting his report. Tr. 388, 391-392.   Reynolds indicated that, combined, the conditions caused Plaintiff to have a "total occupational and social impairment," with a "major impairment" in occupational and social function, as well as in thought and mood, resulting from PTSD, and a "serious impairment" flowing from depression, and "some difficulty" resulting from neurocognitive problems. Tr. 387.   Reynolds indicated, for instance, that Plaintiff was prone to irritable behavior and angry outbursts with little or no provocation, typically expressed as verbal or physical aggression toward people and objects, and that he had problems with concentration, mild memory loss, impairment of short-term and long-term memory which resulted in failure to complete tasks, difficulty in understanding complex commands, difficulty in establishing and maintaining effective social and work relationships and difficulty in adapting to stressful circumstances such as work. Tr. 391-392. Reynolds also noted that Plaintiff had increased suicidal ideation, with a "plan and method," which posed a moderate but not imminent risk. Tr. 392.

On February 23, 2018, VA psychologist Kerry Grohman, Ph.D., ("Grohman") conducted an extensive (4 hour) cognitive evaluation for memory issues related to PTSD and TBI. Tr.

14

461.   Grohman determined that Plaintiff had generally normal memory, though with a mild decline in attention, concentration and working memory when speed was required, and significant symptoms of depression, anxiety and PTSD. Tr. 463, 775, 841.   Grohman noted that Plaintiff attributed cognitive problems to past TBIs, but Grohman disagreed and indicated that such problems were more likely secondary to mood problems, pain from headaches and Plaintiff's use of medical marijuana. *Id*.   Grohman further indicated that Plaintiff's mental functioning would likely improve if he could achieve better sleep by using a CPAP machine for his sleep apnea. Tr. 464.

On March 28, 2018, Nikita Dave, M.D. ("Dave") performed a consultative internal medicine examination of Plaintiff at the Commissioner's request. Tr. 341.   Plaintiff reportedly told Dave, *inter alia*, that he had constant low back pain from his work injury in August 2017. Plaintiff also reportedly told Dave that he had had two TIAs and had suffered "more than ten concussions over the past fifteen years," although, as already discussed, neither of those statements comport with the record.   In any event, Dave's examination produced essentially normal results, though with some tenderness at certain points along the spine, and an x-ray of Plaintiff's lumbar spine was also normal.   Nevertheless, Dave indicated that Plaintiff would have some mild to moderate physical limitations regarding work, apparently basing that finding on Plaintiff's subjective complaints.

Also, on March 28, 2018, consultative psychologist Stephen Farmer, Psy.D. ("Farmer") performed a psychological evaluation of Plaintiff at the Commissioner's request.   Plaintiff indicated that he was receiving treatment through the VA for PTSD, anxiety and depression. Plaintiff reported problems sleeping, irritability, loss of interest, fatigue, depression, anxiety in

crowds, panic attacks and memory loss, but not suicidal ideation. Tr. 336.   Plaintiff indicated

that he was able to perform a wide variety of activities of daily living, but he spent his days on

the couch playing video games.   The results of Farmer's examination were essentially normal,

though Plaintiff seemed anxious and hostile. Tr. 337.     Farmer indicated that Plaintiff could

have mild difficulty with complex instructions and directions, moderate limitations interacting

with people, mild limitation sustaining concentration, moderate limitations sustaining a routine

and attending work, and moderate limitations controlling his emotions and behavior. Tr. 338.

On April 6, 2018, Plaintiff and his VA therapist discussed Plaintiff's recent increase in

suicidal ideation, and what might be causing it. Tr. 399.   They discussed that Plaintiff had

been having problems with his significant other "for some time," and that the suicidal ideation

could be a response to his feelings of rejection.   Additionally, Plaintiff indicated that he felt

depressed and overwhelmed by his various physical medical problems, especially his poorly

controlled diabetes.   However, Plaintiff was reluctant to receive treatment specifically for

suicidal ideation since he felt that it might make him focus more on suicide. Tr. 399.

On April 13, 2018, L. Blackwell Ph.D. ("Blackwell"), an agency review psychologist

employed by the Commissioner, issued a Mental Residual Functional Capacity Assessment.

Tr. 112-114.   Blackwell concluded that Plaintiff would be "moderately limited" in understanding

and remembering detailed instructions, maintaining attention and concentration for extended

periods, performing activities within a schedule, maintaining attendance, completing a workday

and workweek without interruptions from psychological symptoms, interacting appropriately

with the public, accepting instructions and criticism from supervisors and responding to

changes in the workplace. Tr. 112-114.

On June 16, 2018, Vertino reported that Plaintiff had depression, anxiety and some suicidal ideation. Tr. 1225-1226.

On June 29, 2018, Plaintiff told his therapist that he was doing well overall, was about to move into a new house with his girlfriend and her teenage son, and had plans to go on vacation. Tr. 1255.   On July 20, 2018, Plaintiff indicated that he had been on vacation with friends and was planning to propose to his girlfriend. Tr. 1218.

On July 24, 2018, a treatment note indicated that Plaintiff's dizziness was increasing and that Plaintiff was not using his CPAP mask regularly. Tr. 1210, 1223.

On July 26, 2018, Vertino reported that Plaintiff was continuing to worry and obsess, but that overall he was "much more stable than previously," with no suicidal ideation. Tr. 1207. On August 3, 2018, similar symptoms were noted, along with fleeting suicidal ideation. Tr. 1203, 1207.

On November 7, 2018, Vertino wrote a treatment note essentially summarizing Plaintiff's course of treatment for his mental health problems. Tr. 1828. Vertino indicated that Plaintiff had become disabled from working due to a combination of PTSD and physical problems including TBI, migraines, diabetes and urological problems. Tr. 1828.   Vertino indicated that Plaintiff had problems with angry mood, irritability, impulsivity, binge eating, and stress from his upbringing and relationships.   Vertino indicated her belief that Plaintiff was ready to try a "more intensive rehabilitation program." Tr. 1828.   In that regard, the same day as Vertino's note, Plaintiff entered a residential VA PTSD treatment program, but he left the program later that same day, evidently due in part to a urological issue that prevented him from complying with drug testing procedures at the treatment facility. Tr. 388, 1798-1801, 1808,

1816.

On November 26, 2018, Vertino completed a six-page disability questionnaire in which she concluded that Plaintiff was unable to perform most work-related mental functions. Tr. 1670-1675.   For example, Vertino indicated that Plaintiff had "marked" limitations in most categories of mental work functioning, and that he was "never" able to perform a variety of mental work functions. Tr. 1673.

With regard to the instant claim, on March 14, 2018, Plaintiff filed an application for Social Security Disability benefits, claiming that he became disabled on November 21, 2017. Plaintiff claims to be disabled due to a combination of mental and physical impairments.   On November 27, 2018, a hearing was held before an Administrative Law Judge ("ALJ"), at which Plaintiff and a vocational expert ("VE") testified.

On February 27, 2019, the ALJ issued a decision finding that Plaintiff was not disabled at any time between November 21, 2017 and the date of the decision.   The ALJ applied the 5-step sequential evaluation set forth above and found, in pertinent part, at step two, that Plaintiff "had the medically determinable severe impairments of asthma, PTSD, past history of traumatic brain injury, and depression," as well as "the non-severe impairments of diabetes mellitus, lumbar spine strain/sprain, obesity, prostate/urinary problems, headaches, GERD, hypertension, and transient ischemic attacks." Pl. Memo of Law at p. 4.   The ALJ further found, in pertinent part, that Plaintiff nevertheless had the residual functional capacity ("RFC") to perform

> [m]edium work as defined in 20 CFR 404.1567(c) in that he can lift and carry up
> to 50 pounds occasionally, and 25 pounds frequently, can sit up to 6-hours in an
> 8-hour day, and can stand or walk up to 6-hours in an 8-hour day. He is restricted

to moderate-level noise environment (as defined in the Selected Characteristics of occupations, an appendix of the Dictionary of Occupational Titles). He is limited to no more than occasional exposure to irritants such as odors, fumes, dusts, gases and poor ventilation, and no direct exposure to bright or flashing lights. He is limited to simple, routine tasks that can be learned after a short demonstration or within 30-days, work allowing him to be off task 5% of the workday, in addition to regularly scheduled breaks, and work that does not require requiring driving a vehicle, or travel to unfamiliar places. He is limited to work that would not require him to independently develop work strategies or identify workplace needs. He is limited to no more than superficial contact with the public, and up to occasional interaction with coworkers. He is limited to work that does not require teamwork, such as on a production line; work that requires doing the same tasks every day with little variation in location, hours or tasks; and work that is subject to no more than occasional supervision.

Transcript ("Tr.") at pp. 20-31.

With regard to each of the specific limitations in the RFC finding, the ALJ gave a detailed explanation of the reasoning behind the limitation. Tr. 35.   For example, the ALJ stated that he had limited Plaintiff to work that did not involve travel to unfamiliar places and which involved little change in routine, since Plaintiff had indicated that his PTSD required him to know his surroundings and to have certainty. Tr. 35.

At steps four and five of the sequential evaluation, the ALJ further found, based on testimony from the VE, that Plaintiff could perform his past relevant work as a storage laborer, and, alternatively, that he could also perform other jobs in the national economy. Consequently, the ALJ found that Plaintiff was not disabled.

With regard to the medical opinion evidence, the ALJ indicated that he had not given any specific weight to the opinions, but had reviewed and weighed the medical evidence and opinions, including the opinions of treating doctors, in accordance with the Commissioner's

rules for claims filed after March 27, 2017.   Regarding those new rules, another court in this

District recently stated:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior Social
> Security Rulings, including SSR 96-2p, have been rescinded. According to the
> new regulations, the Commissioner "will no longer give any specific evidentiary
> weight to medical opinions; this includes giving controlling weight to any medical
> opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence
> ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan.
> 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the
> Commissioner must consider all medical opinions and "evaluate their
> persuasiveness" based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§
> 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical
> sources, deference to specific medical opinions, and assigning "weight" to a
> medical opinion, the ALJ must still "articulate how [he or she] considered the
> medical opinions" and "how persuasive [he or she] find[s] all of the medical
> opinions." *Id*. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two
> "most important factors for determining the persuasiveness of medical opinions
> are consistency and supportability," which are the "same factors" that formed the
> foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01
> at 5853. An ALJ is specifically required to "explain how [he or she] considered
> the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§
> 404.1520c(b)(2), 416.920c(b)(2). With respect to "supportability," the new
> regulations provide that "[t]he more relevant the objective medical evidence and
> supporting explanations presented by a medical source are to support his or her
> medical opinion(s) or prior administrative medical finding(s), the more persuasive
> the medical opinions or prior administrative medical finding(s) will be." *Id*. at §§
> 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to
> "consistency," "[t]he more consistent a medical opinion(s) or prior administrative
> medical finding(s) is with the evidence from other medical sources and
> nonmedical sources in the claim, the more persuasive the medical opinion(s) or
> prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(2),
> 416.920c(c)(2).

> Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. *Id*. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). *Id*. at §§ 404.1520c(b)(3), 416.920c(b)(3).

*Raymond M. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1313 (ATB), 2021 WL 706645, at *4–5

(N.D.N.Y. Feb. 22, 2021)

Returning to the ALJ's analysis in this case, the ALJ found that the report by PA Vertino, dated November 26, 2018, essentially indicating that Plaintiff was unemployable, was unpersuasive.   In that regard, during his discussion at the second and third steps of the sequential evaluation, the ALJ remarked that Vertino's report was "unpersuasive and unsupported," in that she had merely checked boxes on the form without supportive findings, based on generalizations about Plaintiff's condition that are inconsistent with the rest of the record, including the VA treatment records and the opinions of Farmer and Blackwell. Tr. 25. In stating that Vertino's report was not supported by her own findings, the ALJ specifically referenced Exhibit 14F and Exhibit 8F at pp. 483-484.   Exhibit 14F is Vertino's report, while Exhibit 8F (pages 483-484) is a relatively brief office note dated May 18, 2017, in which Vertino merely notes that Plaintiff's mental status examination that day was normal, with euthymic mood and full affect. Tr. 1001.   Later in his decision, when discussing the RFC finding, the ALJ once again referred to Vertino's report (Exhibit 14F) and her earlier office note (Exhibit 8F at p. 483). Tr. 28, 33, and reiterated that he found Vertino's report to be unpersuasive.

On the other hand, the ALJ found that the opinions of Farmer and Blackwell were

"somewhat persuasive," though he noted that Blackwell did not have access to the entire

record when he issued his opinion, and that Farmer only examined Plaintiff once. Tr. 35.   The

ALJ seemingly gave the greatest weight to the opinions of Dr. Bart, who examined Plaintiff on

November 24, 2017, following Plaintiff's so-called "second TIA", PA Czajkowski ("Czajkowski")

who cleared Plaintiff to return to work following his prostate surgery, and Nurse Stillwell

("Stillwell") who, on July 31, 2017, issued a note indicating that Plaintiff could return to work

"with no restrictions," following some type of unspecified procedure. Tr. 976 (Exhibit 8F at p.

458), 1700.   In that regard, the ALJ indicated that the opinions of Bart, Czajkowski and

Stillwell were "persuasive."   In so doing, the ALJ relied on the opinions of Bart, Czajkowski

and Stillwell to formulate an RFC that was less restrictive than what Farmer and Blackwell had

indicated.

In the instant action, Plaintiff contends that "[t]he ALJ failed to properly evaluate the

opinion evidence of record, he mischaracterized opinion evidence of record, and he relied

upon his own lay interpretation of bare medical findings in arriving at an RFC not supported by

substantial evidence." Pl. Memo of Law at p. 17.   More specifically, Plaintiff states that,

> [i]n weighing the medical opinion evidence of record, the ALJ failed to properly
> evaluate the February 2018 VA C&P [VA disability] examination [by Reynolds]
> and the November 2018 treating opinion from NP Vertino, he mischaracterized
> the opinions from Dr. Bart, PA Czajkowski, and RN Stillwell, and it is clear that
> the ALJ relied upon his own lay interpretation of bare medical findings in
> assessing Plaintiff's RFC.

Pl. Memo of Law at p. 18.   Plaintiff contends, for example, that the ALJ completely failed to

consider Reynold's medical opinion concerning the occupational and social limitations caused

by Plaintiff's PTSD, depression and TBI. *See*, Pl. Memo of Law at P. 19 ("[The ALJ] completely

failed to even mention or evaluate the February 2018 C&P examination by Dr. Reynolds. Though the ALJ summarized the rest of the medical and opinion evidence, he failed to address, at all, the February 2018 C&P examination opinion, despite the fact that this was a medical opinion offered during the relevant period and it was highly relevant to the question of whether Plaintiff could perform substantial gainful activity despite his impairments."). According to Plaintiff, the ALJ "summarily disregarded" Reynold's opinion "because it was predicated upon VA standards." Pl. Memo of Law at p. 18.   On this point, Plaintiff concedes that the ALJ was not bound by the VA's ultimate disability findings, but nevertheless contends that the ALJ should have evaluated Reynold's other opinions.

With regard to the alleged error in evaluating Vertino's opinion, Plaintiff contends that the ALJ erred in finding that the opinion was unpersuasive, in that the ALJ incorrectly stated that the opinion was inconsistent with the rest of the treating record, and failed to consider Vertino's lengthy treating relationship with Plaintiff. *See, e.g.*, Pl. Memo of Law at pp. 22-23 ("It is unclear, based upon all of the . . . findings which were documented in the treatment records, how NP Vertino's opinion of extreme mental limitations were not consistent with the [treatment] reocords.").   Additionally, Plaintiff contends that if the ALJ felt that Vertino's opinions were not well supported, he should have developed the record to seek clarification from her.   Plaintiff further argues that the other reasons the ALJ gave for discrediting Vertino's report, such as the fact that it involved checked boxes on pre-printed form, or that it was received only one day prior to the hearing, are not valid considerations.

Finally, Plaintiff contends that the ALJ mischaracterized evidence, by selectively focusing on entries that while, on the surface, seem to support the ALJ's determination, do not

actually do so.   On this point, Plaintiff specifically refers to the ALJ's heavy reliance on isolated notes from Bart, Czajkowski and Stillwell, that are neither reflective of Plaintiff's overall condition nor really probative of Plaintiff's ability to work on a sustained basis. *See*, Pl. Memo of Law at p. 27 ("The ALJ mischaracterized each of these opinions, making them seem to be more than they actually were in comparison to Dr. Farmer's and Dr. Blackwell's opinions without appropriately describing them and without recognizing that they did not, at all, compare to Dr. Farmer's and Dr. Blackwell's opinions. Because the ALJ used opinions that were not necessarily relevant to the ultimate determination of disability, conclusory statements at that regarding issues reserved to the commissioner, it was improper for the ALJ to represent these as opinions which supported his finding that Plaintiff was not disabled.").[11]   That is, Plaintiff contends that the ALJ "cherry picked" the evidence from Bart, Czajkowski and Stillwell in order to allow him to reach an RFC finding that was even less restrictive than what Farmer and Blackwell had indicated.

The Commissioner disputes each of Plaintiff's arguments.   The Commissioner first contends that the ALJ did not err in failing to consider a medical opinion from Reynolds, since Reynold's report does not constitute a "medical opinion" within the definition of 20 CFR § 404.1513(a)(2). *See*, Def. Memo of Law at p. 24 ("A careful review of this document shows that it is not an 'opinion' under the new regulations.").   More specifically, the Commissioner argues

---

[11] As a final argument, Plaintiff asserts that, "Where, as here, the ALJ does not give controlling or significant weight to any of the medical opinions of record and instead only gives 'some weight' or 'limited weight' to all the opinions, it is reasonable to assume that the ALJ must have relied upon the raw medical data to form his own 'common sense' RFC." Pl. Memo of Law at p. 28.   However, the Court finds that assertion to be overstated, and does not rely on that particular assignment of error in finding that the matter must be remanded. *See, e.g., Lori M. v. Comm'r of Soc. Sec.*, No. 19-CV-1629-LJV, 2021 WL 230916, at *4, n. 7 (W.D.N.Y. Jan. 22, 2021) (rejecting same argument).

that Reynold's report

> focus[ed] on symptoms and diagnosis and not on what Plaintiff can do. Further,
> the only category that potentially suggests what Plaintiff can do is the
> "occupational and social impairment" category, but the check box response
> provides "total occupational and social impairment," which is an issue reserved
> to the Commissioner (Tr. 387). Thus, because this was not an opinion under the
> new regulations, the ALJ was not required to opine on its persuasiveness.

*Id*.   Additionally, the Commissioner contends that the ALJ properly evaluated the opinions of

Vertino, Bart, Czajkowski and Stillwell.

The Court has carefully reviewed and considered the parties' submissions.

## DISCUSSION

Having carefully reviewed the entire record and the parties' submissions, the Court

generally agrees with Plaintiff's arguments, as set forth above, and consequently finds that

remand is required for further administrative proceedings.

To begin with, the Court agrees that the ALJ erred in failing to consider relevant medical

opinion evidence, namely, medical opinions contained within Reynold's report.   The law on

this point is not disputed:

> The Social Security Administration regulations require the Commissioner to
> evaluate every medical opinion received.   Although failure to consider a medical
> opinion might be harmless error if it could not have changed the outcome at the
> agency level, an ALJ's failure to consider a medical opinion is not harmless
> where that opinion is significantly more favorable to the plaintiff than those that
> were considered, and is not otherwise covered by other record evidence.

*Hubbard v. Comm'r of Soc. Sec.*, No. 18-CV-03119 (RWL), 2019 WL 3940150, at *10

(S.D.N.Y. Aug. 5, 2019) (citations and internal quotation marks omitted).   Further, the

Commissioner's regulations define a "medical opinion" in pertinent part as follows:

> Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> ***
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

20 C.F.R. § 404.1513(a)(2)(ii) (Westlaw 2021).

As discussed earlier, Reynolds' report indicates, in pertinent part, that due to the combination of PTSD, depression and TBI-related cognitive impairment, Plaintiff had a "total occupational and social impairment," with a "major impairment" in occupational and social function, as well as in thought and mood, resulting from PTSD, and a "serious impairment" flowing from depression, and "some difficulty" resulting from neurocognitive problems. Tr. 387. Reynolds indicated, for instance, that Plaintiff was prone to irritable behavior and angry outbursts with little or no provocation, typically expressed as verbal or physical aggression toward people and objects, and that he had problems with concentration, mild memory loss, impairment of short-term and long-term memory resulting in a failure to complete tasks, difficulty in understanding complex commands, difficulty in establishing and maintaining effective social and work relationships and difficulty in adapting to stressful circumstances such as work. Tr. 391-392.

The Commissioner maintains that the ALJ properly disregarded these statements since, by referring to a "total occupational and social impairment," Reynolds was expressing an opinion of disability that was reserved to the Commissioner.   However, while the Commissioner is now making that speculative *post hoc* argument, the ALJ did not mention

Reynold's report, and consequently it is unclear whether the ALJ actually considered that Reynold's report was not a medical opinion or whether the ALJ simply overlooked the report in the voluminous record.   In any event, the Court finds that even assuming that Reynolds expressed an opinion concerning Plaintiff's ultimate disability which the ALJ was entitled to reject, he also expressed a medical opinion concerning the effects of Plaintiff's mental impairments on his ability to work which the ALJ was required to consider.   Further, the Court finds that such error was not harmless, considering that Reynolds indicated that Plaintiff had "major impairment" in specified areas of occupational and social function, as well as in thought and mood, resulting from PTSD, along with a "serious impairment" in those areas flowing from depression, and "some difficulty" in those areas resulting from neurocognitive problems. Tr. 387.   Consequently, the Court finds that remand is required for consideration of Reynold's medical opinion.

The Court also agrees with Plaintiff that the ALJ erred in his analysis of Vertino's medical opinion.   For example, the Court agrees that in finding Vertino's report unpersuasive, the ALJ should not have relied in part on the fact that her report was received one day prior to the hearing or that it partially utilized a "check the box" format.   Some of the ALJ's other criticisms of Vertino's report were also unfounded, namely, his assertion that Vertino's report "failed to provide specific findings" and was "vague" about the side effects that Plaintiff experienced from his medications. Tr. 32.   Rather, Vertino indicated specific findings supporting her opinion on pages 2-4 of the report (Tr. 1671-1672), and she indicated that Plaintiff experienced all of the side effects (from his medications) listed on the form, namely, "dizziness, drowsiness, fatigue, lethargy, stomach upset." Tr. 1670.   In sum, the ALJ's

characterization of Vertino's report as "vague" is not accurate.

As for Plaintiff's contention that the ALJ further erred in stating that Vertino's report was inconsistent with the rest of the record, the Court observes that the ALJ did cite a number of treatment notes dated after the alleged disability onset date that are arguably inconsistent with the dire assessments contained in Vertino's report. Tr. 31-32.   The ALJ also cited an office note by Vertino herself, indicating a normal MSE.   However, the Court tends to agree with Plaintiff that in selectively highlighting such evidence, the ALJ gave little attention to other evidence that was arguably consistent with Vertino's report.   In that regard, Plaintiff states:

> The ALJ failed to mention Plaintiff's fluctuating suicidal ideation, and the fact that he was assessed as a high risk for suicide on January 26, 2018, he was placed on the Buffalo VA mental health patient high risk for suicide list on April 12, 2018, and this designation remained in place until July 17, 2018, after which time he continued to fluctuate between no risk and intermediate risk of suicide. (Tr. 789-795, 660-662, 1218-1219). Through the relevant period, Plaintiff also struggled with increased depression, self-isolation, lack of motivation, difficulty sleeping, and PTSD-related symptoms.

> On August 30, 2018, NP Vertino felt that Plaintiff was in need of more intensive work for PTSD, and Plaintiff agreed to attend the residential PTSD program. (Tr. 1655-1656). Plaintiff continued treatment and prepared for admission into the residential PTSD 9-week program, he was accepted into the PTSD residential program on September 18, 2018, as he, among other factors, required the structure and support of a residential treatment environment[.]   [H]e was admitted to the program on November 7, 2018 but left on November 8, 2018 because he felt he wasn't ready to be around people[.]   [H]e [then] felt suicidal and like a failure due to his leaving the residential program. (Tr. 1654-1655, 1650-1651, 1627-1628, 1623-1627, 1652-1654, 1620-1623, 1618-1619, 1592, 1587-1588, 1816-1817, 1798-1802, 1828-1833, 1889-1892, 1896-1904, 1922-1925, 1815-1816, 1826-1827).

> It is unclear, based upon all of the above findings which were documented in the treatment records, how NP Vertino's opinion of extreme mental limitations were

28

> not consistent with the records, especially when NP Vertino felt that Plaintiff
> needed specialized and intensive PTSD treatment in a residential program.
> Interestingly, the ALJ failed to even mention the fact that Plaintiff was referred to
> and accepted into this program because his providers felt that he required a
> higher level of care, as he clearly ignored it in favor of less severe findings which
> fit his narrative. This high level of care requirement is not consistent with the
> ALJ's assertion that Plaintiff was capable of performing substantial gainful
> activity, rather it is consistent with the extreme and disabling limitations in NP
> Vertino's opinion.

Pl. Memo of Law at pp. 22-23.   Beyond this, the Court reiterates that the ALJ failed to

consider Reynold's medical opinion, which, as already discussed, was arguably

consistent with Vertino's report insofar as it indicated that Plaintiff had "major

impairment" in specified areas of occupational and social function, as well as in thought

and mood, resulting from PTSD, along with a "serious impairment" in those areas

flowing from depression, and "some difficulty" in those areas resulting from

neurocognitive problems. Tr. 387.

Finally, the Court agrees with Plaintiff that the ALJ's reliance on the "medical opinions"

of Czajkowski and Stillwell, which consisted of brief notes, written long before the alleged

disability onset date, indicating that Plaintiff could return to work, was misplaced insofar as

those notes are neither reflective of Plaintiff's overall condition nor really probative of Plaintiff's

ability to work on a sustained basis.   Despite that, the ALJ found those opinions, along with

the opinion of Dr. Bart, to be the most "persuasive" "medical opinions" in the record.   In other

words, the ALJ found those brief, non-probative notes to be even more persuasive than the

detailed, highly probative reports by the Commissioner's own consultative examiners (Dr.

Dave, Dr. Farmer and Dr. Blackwell).

Since the matter is being remanded, the Court further directs that the Commissioner consider the ALJ's analysis at step two of the sequential evaluation, even though Plaintiff has not raised this issue.   In that regard, the ALJ did not include sleep apnea, either as a severe- or non-severe impairment.   Indeed, the ALJ asserted that "[t]here is no indication that the claimant has a significant sleep apnea condition." Tr. 23.   This seems odd, and contrary to the record, since based on the evidence discussed above, this condition appears to affect Plaintiff's day-to-day functioning at least as much as his asthma, which the ALJ found to be a severe impairment.   For example, multiple doctors have indicated that Plaintiff's chronic daily headaches are likely caused by his sleep apnea, as opposed to a TBI. Tr. 967, 1103.   Dr. Grohman also indicated that Plaintiff's inability to use his CPAP machine, due to difficulty with the mask, was likely negatively affecting his cognitive functioning. Tr. 464.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 9) for judgment on the pleadings is granted, Defendant's cross-motion (ECF No. 14) for the same relief is denied, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Decision and Order.

So Ordered.

Dated: Rochester, New York
    March 5, 2021

ENTER:


   /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge